# WILLIAMS *v.* PAINE.

### APPEAL FROM THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA.

No. 114.   Argued November 29, 30, 1897. — Decided January 10, 1897.

Under the laws of Maryland, which were in force in the District of Columbia in 1859, it was competent for a married woman, outside of the District, to execute, with her husband, a power of attorney to convey her lands therein, which, when acknowledged by her according to the statute relating to the acknowledgment by married women of deeds conveying their real property in the District, thereby became a valid and sufficient instrument to authorize the conveyance by attorney; and the first section of the act of March 3, 1865, c. 110, 13 Stat. 531, contains a clear legislative recognition of the right to execute such power.

Such a power of attorney, executed in one of the Northern States before the civil war by a married woman then residing there, was not revoked by the fact that when that war broke out she and her husband removed to the Southern States, where he entered the Confederate service, and where she resided to the close of the war.

When the purchase money for land sold under such a power is received by the principal, to permit her heirs after her death to repudiate the transaction, on the ground that the power of attorney had been revoked by the war, would be in conflict with every principle of equity and fair dealing.

A majority of the court think that the deed made under the power of attorney which is in controversy in this suit, and which is printed at length in the Statement of the Case, below, was in the nature of a conveyance of the legal title, though defectively executed, and that it came within the provisions of the act of March 3, 1865, and its defective execution was thereby cured.

By this disposition of the whole case upon the merits the court is not to be considered as deciding that parties situated as the plaintiffs were in this case, out of possession, can maintain an action for partition.

THE appellants herein brought this suit in the Supreme Court of the District of Columbia for the purpose of obtaining

partition of certain lands in the city of Washington, known as square 53 of the ground plan of that city.

Upon the trial it appeared that the common source of title was one George W. Peter, who, in January, 1837, conveyed the premises to Henry Huntt and Benjamin Ogle Tayloe as tenants in common. Mr. Huntt died in 1838 intestate, leaving two daughters, Fannie and Mary, and a son named George Gibson Huntt, to whom his undivided interest in these lands descended. Fannie married an officer in the United States Army named Gibson, and Mary married an officer in that army named Robert Ransom, Jr. In May, 1859, Lieutenant Ransom was stationed at Carlisle Barracks in Pennsylvania, and at that time he and his wife executed and acknowledged a power of attorney to the brother of Mrs. Ransom, to convey their interest in the land, the material part of which power reads as follows:

"Know all men by these presents, whereas Lieut. Robert Ransom, Jr., of the United States Army, and Mary his wife in right of the said Mary are seized in fee-simple as tenants in common, with the sister and brother of the said Mary, to wit, Fanny Huntt and George Gibson Huntt and with B. O. Tayloe of certain lots of ground in the city of Washington in the District of Columbia, which are described as follows: [Describing among others the lots in question.] To provide for the contingency of our absence we, the said Robert Ransom, Jr., and Mary my wife, do by these presents constitute and appoint and in our place put and depute the said George Gibson Huntt, of Washington city aforesaid, to be our true and lawful attorney in fact for us, and in our name place and stead to control, manage, grant, bargain and sell, and in that event convey all our right, title and interest in and to the said lots and square of ground or any part or parts thereof, or to join in and for us and in our name to sign any proceedings in partition of the said lots and square, or to appear for us in court for that purpose; and in regard to the said real estate to do, execute and perform every act and thing necessary to be done as fully and amply as we might or could do if personally pres-

ent, and we do hereby ratify and confirm all and whatsoever our said attorney in fact may legally do in the premises.

"In witness whereof we, the said parties to these presents, have hereunto set our hands and seals this twenty-third day of May, A.D. one thousand eight hundred and fifty-nine.

"Witnesses present:          R. RANSOM, Jr.  [SEAL.]
        "S. H. GRAHAM.          M. H. RANSOM.  [SEAL.]
        "A. L. SPONSLER."

This paper was duly acknowledged by both Lieutenant Ransom and his wife, the latter of whom made the acknowledgment necessary to be made in the District of Columbia in order to convey real estate by a married woman.

The acknowledgment and the certificate thereof are full and complete, and taken and certified by a proper officer.

The premises in question at that time were vacant lots. Soon after the execution of this power of attorney, Lieutenant Ransom was ordered away, and, with his wife, he left the station at Carlisle Barracks and went to Fort Lyon in the western country. He was a native of one of the Southern States, and when the war broke out he resigned his commission in the army and entered the Confederate service, and at the conclusion of the war he had risen in that service to the rank of general. Mrs. Ransom's brother, George Gibson Huntt, to whom the power of attorney above mentioned was given, remained in the old army. At the conclusion of the war General Ransom returned with his wife to his native State, North Carolina, where she died in February, 1881, leaving a number of children who are complainants herein. He remained in that State until his death in January, 1892.

During the continuance of the war, the children of the deceased Mr. Huntt became anxious to sell their interest in the premises in question, as the land was still vacant and unimproved, and a source of expense in the way of the payment of taxes. It was more particularly on account of Mrs. Ransom that the sale was desired, in order to aid her as far as possible by turning her interest in the lands into money. Negotiations for the sale of the property were therefore com-

menced some time in 1864 through a real estate agent employed by Mr. Walter S. Cox, a distant relative of the parties and then a practising lawyer at the bar of the District, now one of the Justices of the Supreme Court thereof. These negotiations resulted in the sale of all their interest in the property to Mr. Tayloe, the owner of the other half interest therein, and deeds were duly given therefor by Mrs. Gibson and Mr. Huntt to Mr. Tayloe, and on the 29th of November, 1864, Mr. Huntt, assuming to act under the power of attorney already mentioned, executed, acknowledged and delivered to Mr. Benjamin O. Tayloe a paper which reads as follows:

"Know all men by these presents, that I, George Gibson Huntt, by virtue of the annexed power of attorney to me from Robert Ransom, Jr., and Mary Ransom, his wife, and for and in consideration of the sum of eight hundred and thirty-three $\frac{33}{100}$ dollars to me in hand paid by Benjamin Ogle Tayloe, of the city of Washington in the District of Columbia, the receipt of which is hereby acknowledged, have bargained and sold to said B. O. Tayloe, his heirs and assigns, all the right, title and estate of them, the said Robert Ransom, Jr., and Mary Ransom, being one undivided third part of, in and to those pieces of ground in the city of Washington aforesaid, known and described as lots Nos. one and three in square No. five, lot No. ten in square No. fourteen, lots Nos. five and nine in square No. seventeen, lots Nos. three and four in square No. twenty-eight, lot No. three in square No. thirty and the whole of square No. fifty-three, with the improvements and appurtenances; and I hereby further agree in behalf of said Robert and Mary Ransom, that they shall and will, as soon as convenient, make and execute a proper deed of conveyance of said premises to said Benj'n O. Tayloe, in fee-simple.

"In testimony whereof I have hereunto set my hand and seal this 29th day of November, A.D. 1864.

"GEORGE GIBSON HUNTT. [SEAL.]

(Stamp, $1. G. G. H. Jan. 4th, '65.)

"Witness: W. Kline."

This paper was acknowledged by Huntt before officers dif-

ferent from those before whom proof of the power of attorney was made. It was also and on the 14th day of January, 1865, recorded in the proper land records office in the District of Columbia, together with the power of attorney already referred to.

The purchase price of the lands was paid to Mr. Cox, who promptly paid over her share to Mrs. Gibson, and also included in such payment the share belonging to Mrs. Ransom, and Mrs. Gibson duly paid over Mrs. Ransom's share to her or expended the same for her benefit and with her approval. This was done prior to the close of the war, while Mrs. Ransom was within the lines of the Southern army with her husband, and Mrs. Gibson was in one of the Northern States.

After the death of Mr. Tayloe, which occurred in 1868, one of his daughters, Julia Tayloe, in November, 1870, succeeded, under proceedings in partition, to all the interest of her father in the premises. She married in 1865 the defendant, John W. Paine, and the other three defendants are the children of such marriage. From the time of the division of the estate of Mrs. Paine's father, Mr. Tayloe, which took place in 1870, his daughter, Mrs. Paine, claimed to be the owner of the property, and was in possession thereof, renting it through her husband and his agents, for a coal yard and for other purposes, and paying the taxes upon the same up to the time of her death in 1872, since which time her husband has been in possession, claiming the right as tenant by the courtesy, and his three children claim title in fee, subject to the life estate of their father.

Prior to the filing of this bill Mr. Paine had expended large sums of money in building twenty-two dwelling houses on the property at a cost of about $125,000, and has received the rents from such houses and paid the taxes on the property, the whole property being now estimated to be worth about $250,000. The sum at which the property was sold in 1864 was a fair price for the same and the best that could be secured after earnest efforts made to sell it.

After the death of Robert Ransom and his wife this bill was filed by their children, and the relief sought is to have

the paper executed by Mrs. Ransom's brother, George Gibson Huntt, under the power of attorney given by her husband and herself, declared null and void as a cloud upon the title of the complainants in this property, and the bill then asks that the right of the complainants to a one sixth (Mrs. Ransom's alleged) interest in the land in fee as tenants in common with the defendants may be established against all the defendants, as well the life tenant as the reversioners, and the land partitioned accordingly.

Upon these facts the Supreme Court of the District of Columbia dismissed the bill with costs, and its judgment to that effect, having been affirmed by the Court of Appeals of the District, 7 D. C. App. 116, the case is now here upon the complainants' appeal from that judgment of affirmance.

*Mr. Franklin H. Mackey* for appellants.

*Mr. Calderon Carlisle* and *Mr. William G. Johnson* for appellees.

MR. JUSTICE PECKHAM, after stating the case, delivered the opinion of the court.

The questions in this case grow out of the execution of the power of attorney by Lieutenant Ransom and his wife while at Carlisle Barracks, Pennsylvania, in 1859.

It is claimed on the part of appellants, (1) that the power of attorney given by Mrs. Ransom, a married woman, (jointly with her husband,) could not operate as a valid authority to the attorney named therein to convey her real estate, because a married woman could not convey real estate by a power of attorney; (2) that the power of attorney was revoked by the war; (3) that the paper executed by the attorney in fact pursuant to the power of attorney was not a conveyance, and did not pass the title of Mrs. Ransom to Mr. Taylce; (4) that these difficulties were not cured by the act of Congress of March 3, 1865, c. 110, 13 Stat. 531, entitled "An act to quiet

titles in favor of parties in actual possession of lands situated
in the District of Columbia," as that act only applied to
instruments conveying lands and to parties who were in
actual possession at the time when the act was passed, and the
paper executed by the attorney was not a conveyance, and
when the act was passed the premises in question were vacant;
(5) that the purchase price for her interest in that land was
never received by Mrs. Ransom, and her heirs are not es-
topped from setting up the invalidity of the alleged contract.
of sale or conveyance upon any equitable grounds.

The first section of the above act is set out in the margin.[1]

---

[1] *Be it enacted by the Senate and House of Representatives of the United
States of America in Congress assembled,* That all deeds heretofore recorded
in the land records of the District of Columbia, which have been executed
and acknowledged by femmes covert (their husbands having signed and
sealed the same) for conveying any real estate, or interest therein, situated
in said District; and all acknowledgments of deeds heretofore recorded, as
aforesaid, which have been made by femmes covert (whether they have
executed the deed or not) for the purpose of releasing their claims to dower
in the lands described therein, situated as aforesaid, in which acknowledg-
ments the form prescribed by law has not been followed ; and all deeds
heretofore recorded, as aforesaid, which have been executed and acknowl-
edged by an attorney in fact, duly appointed for conveying real estate
situated in said District; and all deeds heretofore recorded, as aforesaid,
executed and acknowledged, or only acknowledged by such attorney in
fact, for conveying real estate situated in said District, as to which the
acknowledgment was made before officers different from those before whom
proof of the power of attorney was made, and as to which the power of
attorney was proved before only one justice of the peace; and all deeds
heretofore executed and recorded as aforesaid for the purpose of convey-
ing land situated in said District, acknowledged out of the District of
Columbia, before a judge of a United States court, or before two aldermen
of a city, or the chief magistrate of a city, or before a notary public; and
all deeds heretofore executed and recorded as aforesaid for the purpose of
conveying land situated in said District, acknowledged by an attorney in
fact, duly appointed, or by an officer of a corporation, duly authorized, who
has acknowledged the same to be his act and deed, instead of the act and
deed of the grantor or of the corporation; and all deeds heretofore executed
and recorded as aforesaid for the purpose of conveying land situated in
said District to which there is not annexed a legal certificate as to the
official character of the officer or officers taking the acknowledgment, shall
be, and the same are hereby, declared to be of the same effect and validity
to pass the fee-simple or other estate intended to be conveyed, and bar

Very careful and well-considered opinions have been de-
livered in the case, both in the Supreme Court and in the
Court of Appeals of the District, in which these various
questions are discussed. The Supreme Court held that the
two papers (the power of attorney and the instrument exe-
cuted in pursuance thereof) were so far valid as to be subject
only to such objections and defects of form of execution and
acknowledgment as could be cured by legislation, and these
defects were cured by the act of Congress; that this statute
was constitutional, and that the power of attorney was not
revoked by the war, but was in full force and valid when the
deed by the attorney was executed. The court also thought
the defence which had been set up, that the complainants
were at the commencement of the suit and thereafter out of
possession and their title denied by the defendants, who were

---

dower in the real estate therein mentioned in favor of parties in actual
possession, claiming under and through such deeds, as if such deeds had
been by such femmes covert executed and acknowledged, or acknowledged
in case of a dower right, in the form heretofore prescribed by law; as if
such deeds had been executed and acknowledged by the grantor in the deed;
as if such power of attorney had been proved before the officer or officers
taking the acknowledgment; as if such power of attorney had been proved
before two justices of the peace; as if such acknowledgment had been
made before any judge of a state court, or before two justices of the
peace; as if such attorneys in fact or officer of a corporation had acknowl-
edged the deed to be the deed of the grantor or of the corporation; as if
such deeds had thereto annexed a certificate, in legal form, that the officer
or officers taking the acknowledgment were really what they purport to ·
be: *Provided*, That the certificate of acknowledgment by a femme covert
shall show that the acknowledgment was made " apart" or " privily " from
her husband, or use some other term importing that her acknowledgment
was made out of his presence, and also that she acknowledged or declared
that she willingly executed or that she willingly acknowledged the deed,
or that the same was her voluntary act, or to that effect: *And provided,
also,* That when the power of attorney shall have [been] executed by a
femme covert the same shall be effectual and sufficient if there shall have
been such an acknowledgment of the same as would be sufficient, under
the provisions of this act, to pass her estate and interest therein were she
a party executing the deed of conveyance, the record and copy thereof of
any deed recorded as aforesaid to be evidence thereof, in the same manner
and to have the same effect as if such deed had been originally executed,
acknowledged and recorded according to law.

in actual and full possession, was an answer to the bill for partition even if there had been no other defence proved. The bill was therefore dismissed.

The Court of Appeals, while discussing somewhat the defence that complainants were out of possession, did not decide the case upon that ground, but held that the power of attorney (properly acknowledged by Mrs. Ransom, as above stated) duly conferred upon the attorney in fact the legal power to convey Mrs. Ransom's interest in the land; that the war did not revoke the power; that the paper executed and delivered by the attorney in fact was not a conveyance, but only a contract for the sale and conveyance of the land; that the act of Congress did not apply to such a paper; and, lastly, that the contract of sale was within the scope of the power of attorney, and vested in the purchaser an equitable interest or estate which, upon general equitable principles, a court of equity would not divest out of the vendee in the absence of fraud, and no fraud being alleged or shown, and the purchase money having been received by Mrs. Ransom, equity would not set aside the sale. We will now state the conclusions to which we have come regarding these questions:

And, first, as to the question whether the power of attorney executed by Lieutenant Ransom and wife to George Gibson Huntt authorized and enabled the attorney to bargain and sell and convey, or contract to convey by deed of bargain and sale, the property therein mentioned. We think it did.

Under the laws of Maryland, which were in force in the District of Columbia in 1859, we think it was then competent for a married woman, outside of the District, to execute, with her husband, a power of attorney to convey her lands therein, which, when acknowledged by her according to the statute relating to the acknowledgment by married women of deeds conveying their real property in the District, thereby became a valid and sufficient instrument to authorize the conveyance by attorney. It is not claimed that the acknowledgment to the power of attorney in this case was insufficient in matter of form to comply with the statute in that respect.

The real contention is, assuming the acknowledgment to have been sufficient, that a married woman could not by any manner of acknowledgment appoint an attorney with authority to convey her lands. It is true that by the common law a married woman could not convey an estate of freehold owned by her unless by levying a fine or suffering a common recovery. This was altered by the statute in England of 3 & 4 Will. IV, c. 74, abolishing fines and recoveries, and providing other means for the conveyance of estates. In most, if not all, of the States of the Union, statutes have been passed providing for the manner in which a married woman can dispose of her real estate. These statutes were intended to and did set aside the technicalities of the common law, and they provided some simple and effectual method for the transfer of the interests of married women in real estate. The Chief Justice of the Court of Appeals of the District of Columbia, in delivering the opinion of that court in this case, has cited several Maryland statutes which the court holds were in force in this District in 1859, and those statutes are also held to provide for the case of the execution of a power of attorney by a married woman joined in by her husband and privily acknowledged by her, authorizing the attorney in fact to convey her real property in the District.

This separate acknowledgment is provided for in probably all the statutes of the various States relating to the subject of the conveyance by married women of any interest they may have in real estate. It has been said to be the most important and essential element in the method employed to transfer such estates.

The statutes referred to in the opinion are the statutes of Maryland of 1715, c. 47; 1752, c. 8; and 1766, c. 14; and in those statutes the ceremony of the private examination of the married woman and her voluntary acknowledgment of the deed were made substitutes for the private examination as to her voluntary consent in the levying of the fine or the suffering of a common recovery. After citing these various statutes of Maryland and commenting upon their provisions relating to conveyances of married women, the Chief Justice, in his opinion in this case, says:

"These provisions of the acts of 1715 and 1766 were in force in this District in 1859, and are still in force, and they were in no respect repealed by or in conflict with the acts of Congress of the 31st of May, 1832, (4 Stat. 520,) and of the 20th of April, 1838, (5 Stat. 226, relating to the execution and acknowledgment of deeds for land in the District of Columbia. The acts of Congress do not profess to repeal the acts of Maryland of 1715 and 1766, or to be exclusive in their operation; but they have, in some particulars, not involved here, amplified and extended the provisions of the former statutes then in force. And, construing these statutes all together, and looking to the reason and policy upon which they are founded, it would seem to be clear that in the year 1859 and down to the year 1865, it was competent to a *feme covert*, by a joint power of attorney with her husband, duly executed and acknowledged according to the forms prescribed by the statute, to execute and acknowledge a valid deed of conveyance of her real estate situate in the District of Columbia. It is well settled that a power to convey land must possess the same requisites, and observe the same solemnities in execution and acknowledgment, as are necessary in a deed directly conveying the land; and that a title to land can only be acquired and lost according to the laws of the place where the land is situated. (*Clark* v. *Graham*, 6 Wheat. 577.) In this case, the property to be conveyed was specifically mentioned and described in the power of attorney; and the power of attorney was executed and acknowledged at Carlisle, in the State of Pennsylvania, by husband and wife, under their hands and seals, and the acknowledgment and authentication of the instrument was in all respects in accordance with the provisions of the statutes in force in the District of Columbia, providing the manner and form in which the real estate of *femes coverts* could be conveyed. Indeed, we do not understand that the statutory requirement in respect to the form of acknowledgment and authentication thereof, is a matter of objection. The terms of the statutes, 'any grantor or bargainor of any lands or tenements,' being out of the province; or 'any person or persons conveying,' etc.; not residing in the prov-

ince at the time,' etc., 'may acknowledge said deed by letter of attorney, well and sufficiently proved,' etc., are sufficient to embrace *femes coverts*, authorized to sell and convey their real estate. If not, then the husband could not sell and convey by power of attorney, free of the contingent right of dower of his wife, for if the wife could not acknowledge by power of attorney a deed for the conveyance of her own real estate, she would be equally unable to acknowledge, by power of attorney, a deed for the relinquishment of dower in the lands of her husband. Such disability, we think, was never intended by the legislatures passing the statutes to which we have referred, to be fixed upon *femes coverts*, having lands with right to convey the same."

We give great weight to the views expressed by the Chief Justice in regard to these statutes of Maryland because, as is well known, he occupied for many years a seat upon the bench as Chief Justice of the Court of Appeals of that State, and is specially familiar with its laws and the construction given them by the courts of the State. In addition to such circumstance and from a perusal of the various statutes cited, our own judgment concurs with the Court of Appeals upon this question. We think a clear implication arises from the provisions of these acts that a power of attorney such as has been described, and acknowledged as already mentioned, was good in 1859 in this District. We can think of no good reason for excluding such implication. Where the person is by the statute allowed to do the principal thing directly, we think she could do it by power of attorney as described in this case. The power to convey includes in such case the power to appoint another to do the same thing. We, therefore, agree with the views expressed by some of the text writers, when power is given by statute to married women to convey their interest in real estate where their husbands join in the conveyance and where the private examination is made, that in such cases the right of the wife to dispose of it by power of attorney joined in by her husband and where she was privately examined, etc., would naturally be implied. The common law which incapacitates a married woman from making a contract

in general is so far altered by the statute as to permit her to execute a power of attorney and to therein contract to ratify his acts, instead of conveying directly, as the statute in terms provides. (See Washburn on Real Property, [4th ed.] vol. 3, p. 258.) The author there says: "It is laid down unqualifiedly, in some of the States, that a married woman cannot make a valid power of attorney, even jointly with her husband, to make a deed of her interest. But it is difficult to perceive any reason for the rule where she can do the principal thing herself; and such a right is clearly recognized by statute in Massachusetts. A similar right is also recognized by statute in New York." We do not think the aid of a statute is necessary. When the power is given her by law to convey directly, she can by the same ceremonies authorize another to do the act for her. The reasoning which would prevent it is, as we think, entirely too technical, fragile and refined for constant use. It is said in Story on Agency, sec. 6: "So in regard to married women, ordinarily they are incapable of appointing an agent or attorney; and even in case of a joint suit at law, an appointment of an attorney by a married woman is void; and her husband may make an attorney for both. But where a married woman is capable of doing an act, or of transferring property or rights with the assent of her husband, there, perhaps, she may, with the assent of her husband, appoint an agent or attorney to do the same." In this case we hold that, as the wife was capable of conveying her real estate in Washington in 1859, by a deed, properly executed and acknowledged by her privily, etc., and joined in by her husband, she could accomplish the same thing by authorizing another to convey for her, where the authority was joined in by her husband, and the required private examination, etc., made.

The Court of Appeals of Maryland has never, so far as we can discover, construed the statutes above cited in any manner opposed to the views expressed by the Court of Appeals of this District in this case. The cases of *Webster's Lessees* v. *Hall*, 2 Harr. & McII. 19; *Flannigan* v. *Young*, 2 Harr. & McII. 38; *Hollingsworth* v. *McDonald*, 2 Harr. & Johns. 230;

and *Lawrence* v. *Heister*, 3 Harr. & Johns. 371, in which the above-named statutes are referred to, were all cases where deeds had been executed and where the acknowledgment of either the wife or the husband was held to be defective under the provisions of those statutes. In some of the cases it was said to be necessary, in order to pass the interest of the wife in her land, that she and her husband must join in the deed as grantors, which must be properly acknowledged, etc. This statement was not made as descriptive of the only method by which a married woman could convey her land, but was made in relation to the defective manner in which the deed of conveyance was executed in the particular case, which was the case of a deed defectively acknowledged under the statute. No decision has been cited by counsel for the appellants from the courts of Maryland which is inconsistent with or opposed to the construction given to these statutes by the court below.

In *Holladay* v. *Daily*, 19 Wall. 606, 610, the plaintiff and his wife appointed an attorney with general power to convey land which belonged to the husband. The attorney in fact subsequently conveyed the lands, and the plaintiff Holladay, after such conveyance, alleging that he had never received any of the consideration money recited in the deed, sued to recover back the possession of the land. The only question was as to the sufficiency in law of the power of attorney from Holladay and wife to Hughes, the attorney in fact, and his deed thereunder to pass the title of the husband. It was held that the power was sufficient, the court saying: "Here the object, and the sole object, of the power was to enable the attorney to pass the title freed from any possible claim of the wife; and under the law of Colorado that result could be accomplished by the deed of the husband alone as fully without as with her signature." What was said by the learned justice in delivering the opinion of the court in that case in regard to the manner in which the interest of married women in real estate could be conveyed was not necessary to the decision of the case, the point decided being that, considering its form, the power of attorney signed by the husband and wife was valid to convey his interest in the real property.

Finally, upon this branch of the case, we also concur with the lower court in holding that the first section of the act of Congress, already mentioned, contains a clear legislative recognition of the right to make this power of attorney. In this case, we think this fact is entitled to exceptional consideration. The act was evidently drawn with care, and it fully and plainly describes the different defects of the various instruments upon which it was intended to operate. Although the section is quite long and the phraseology is somewhat involved, yet the meaning of the section is perfectly clear. Certain provisions therein fully recognize the then existing right of a married woman to appoint jointly with her husband an attorney in fact to convey lands owned by her in this District, and language is used for the purpose of curing certain named defects which might exist in the execution or acknowledgment of such a paper. Speaking of the acknowledgment, the statute in the first section proceeds in this way: "*And provided, also,* That when the power of attorney shall have been executed by a *feme covert,* the same shall be effectual and sufficient if there shall have been such an acknowledgment of the same as would be sufficient, under the provisions of this act, to pass her estate and interest therein were she a party executing the deed of conveyance, the record and copy thereof of any deed recorded as aforesaid to be evidence thereof, in the same manner and to have the same effect as if such deed had been originally executed, acknowledged and recorded according to law." It had already been provided in the section "that the certificate of acknowledgment by a *feme covert* shall show that the acknowledgment was made 'apart' or 'privily' from her husband, or use some other term importing that her acknowledgment was made out of his presence, and also that she acknowledged or declared that she willingly executed or that she willingly acknowledged the deed, or that the same was her voluntary act, or to that effect."

The acknowledgment attached to the power of attorney in this case was sufficient under the provisions of this act to pass the estate and interest of Mrs. Ransom if she had been a

party executing a deed conveying her real estate in the District.

Upon a consideration of all the circumstances, we have no doubt that the power of attorney in question was properly executed and acknowledged, and that it authorized the person named therein as attorney in fact to convey Mrs. Ransom's real estate situated in this District.

(2.) The next question which arises is whether this power of attorney was revoked by the war which broke out between the two sections of the country in 1861.

Lieutenant Ransom, although one of the last officers to go out, did resign his commission in the army of the United States and went South and entered the army of the Confederacy, in which, before the close of the war, he attained high rank. His wife followed him, so that during the war they were both inside the lines of the Confederacy.

We are of opinion that the war did not revoke the power of attorney executed by Mrs. Ransom and her husband. It is not every agency that is necessarily revoked by the breaking out of a war between two countries, in which the principal and agent respectively live. Certain kinds of agencies are undoubtedly revoked by the breaking out of hostilities. Agents of an insurance company, it is said, would come within that rule. *Insurance Company* v. *Davis*, 95 U. S. 425, 429. In that case Mr. Justice Bradley, in delivering the opinion of the court, said:

"That war suspends all commercial intercourse between the citizens of two belligerent countries or States, except so far as may be allowed by the sovereign authority, has been so often asserted and explained in this court within the last fifteen years that any further discussion of that proposition would be out of place. As a consequence of this fundamental proposition it must follow that no active business can be maintained, either personally or by correspondence, or through an agent, by the citizens of one belligerent with the citizens of the other. The only exception to the rule recognized in the books, if we lay out of view contracts for ransom and other matters of absolute necessity, is that of allowing the payment

of debts to an agent of an alien enemy, where such agent resides in the same State with the debtor. But this indulgence is subject to restrictions. In the first place, it must not be done with the view of transmitting the funds to the principal during the continuance of the war; though, if so transmitted without the debtor's connivance, he will not be responsible for it."

The learned judge then adds that, in order to the subsistence of the agency during the war, it must have the assent of the parties.

These remarks were made in relation to the case then before the court, which was an action on a policy of life insurance issued by a New York corporation before the war upon the life of Davis, a citizen and resident of the State of Virginia. The premiums were regularly paid until the beginning of the war, the last one having been made December 28, 1860. Previous to the war the company had an agent residing in Petersburg, Virginia, where the assured also resided, and premiums on the policy had been paid him in the usual way. About a year after the war broke out the agent entered the Confederate service and remained there until the close of the war. An offer of payment of the premium due in December, 1861, was made to the agent, which he declined to receive, alleging that he had received no receipts from the company, and that the money, if he did receive it, would be confiscated by the Confederate government. He testified that he refused to receive any premiums, had no connection with the company during the war, and after it terminated did not resume his agency. Davis died in September, 1867. The plaintiff below was assignee of the policy, and claimed to recover the amount of ten thousand dollars on the ground that he was guilty of no laches and that at the close of the war the policy revived. The judge instructed the jury that if the assured was ready and offered to pay his premium to the agent in Virginia, after the breaking out of the war, there was no forfeiture of the policy, although the agent refused to receive the money, if within a reasonable time after the war he endeavored to pay his premium and the company refused to receive it. The defendant contended that the war put an end

to the agency, and that the offer to pay the premium to the former agent was of no validity, and the failure to pay rendered the policy void. This court held that the case was nearly on all fours with that of the *New York Life Insurance Company* v. *Statham*, 93 U. S. 24, but the point as to the supposed power of an agent of a company in the adhering States to receive premiums in a State in insurrection after the war broke out not having been specially adverted to in the opinion of the court in that case, it was particularly considered in the *Davis case*, as above quoted from. It was in relation to such an agency that the remarks were made. Agents of a life insurance company are undoubtedly engaged in the active business of their principal. Their duty is to receive the premiums for all policies obtained by them and to transmit such premiums to the home office. The prompt transmission of such premiums is a necessity for the successful prosecution of the business of the company. Upon their receipt the company is able to invest them in some interest-bearing security, and thus provide funds for the ultimate payment of the policy when it matures. It is easy to see that active and continuous business of such a nature could not be carried on during a war where the principal and the agent reside in the different countries engaged in such war.

In the case of *Kershaw* v. *Kelsey*, 100 Mass. 561, the general subject of contracts and business entered into and transacted between the citizens of the different States at war with each other is examined, and the question treated with great care by Mr. Justice Gray in delivering the opinion of the Supreme Judicial Court of Massachusetts, and numerous authorities are referred to and commented upon in the opinion. In the course of that opinion it was said at page 572: "The result is, that the law of nations, as judicially declared, prohibits all intercourse between citizens of the two belligerents which is inconsistent with the state of war between their countries; and that this includes any act of voluntary submission to the enemy, or receiving his protection; as well any act or contract which tends to increase his resources; and every kind of trading or commercial dealing or intercourse, whether by

transmission of money or goods, or orders for the delivery of either, between the two countries, directly or indirectly, or through the intervention of third persons or partnerships, or by contracts in any form looking to or involving such transmission, or by insurances upon trade with or by the enemy. Beyond the principle of these cases the prohibition has not been carried by judicial decision. The more sweeping statements in the text-books are taken from the *dicta* which we have already examined, and in none of them is any other example given than those just mentioned. At this age of the world, when all the tendencies of the law of nations are to exempt individuals and private contracts from injury or restraint in consequence of war between their governments, we are not disposed to declare such contracts unlawful as have not been heretofore adjudged to be inconsistent with a state of war."

Under the circumstances of this case, we think the attorney in fact had the right to make the conveyance he did. It was not an agency of the class such as is mentioned in *Insurance Company* v. *Davis, supra,* and was not necessarily revoked and avoided by the war. Where it is obviously and plainly against the interest of the principal that the agency should continue, or where its continuance would impose some new obligation or burden, the assent of the principal to the continuance of the agency after the war broke out will not be presumed but must be proved, either by his subsequent ratification or in some other manner. And on the other hand, where it is the manifest interest of the principal that the agency, constituted before the war, should continue, the assent of the principal will be presumed. Or, if the agent continues to act as such, and his so acting is subsequently ratified by the principal, then those acts are just as valid and binding upon the principal as if no war had intervened. *Insurance Company* v. *Davis, supra.*

It is entirely plain, as we think, that the mere fact of the breaking out of a war does not necessarily and as a matter of law revoke every agency. Whether it is revoked or not depends upon the circumstances surrounding the case and the

nature and character of the agency. This case shows that in 1859, at the time when the power of attorney was executed, Lieutenant Ransom and his wife were desirous of realizing their share of the value of the land in controversy. It was vacant, unimproved land in the city of Washington, and the charge for taxes was quite burdensome. The parties desired to realize the money. No sale of the property was effected from that time until the latter part of 1864, or early part of 1865. There is no evidence of any such change of circumstances as would naturally suggest a revocation of the authority to sell, but on the contrary the testimony is otherwise. It appears to have been to the interest of all parties to sell and thus to free themselves from a constant source of expense. In addition to that, the evidence is clear and sufficient that after the sale the action of the attorney in fact of Mrs. Ransom was ratified and confirmed by her by the receipt of her share of the purchase money or its expenditure for her benefit and with her assent and approval. Her sister, Mrs. Gibson, testified that Mrs. Ransom's share of the purchase money was either paid over to her or expended for her at her direction. This full and complete ratification of the act of the agent shows conclusively the assent of the principal to the continuance of the agency notwithstanding the war. Some criticism is made upon this testimony of Mrs. Gibson because, after the passage of so many years, she is unable to state definitely which course was pursued, whether the money was paid to Mrs. Ransom, or whether it was expended for her at her direction. We think the criticism is not well founded. Mrs. Gibson might well have been able to state with absolute certainty that she either paid the money to Mrs. Ransom or expended it for her at her direction, and yet after this lapse of time she might also be unable to state with like certainty which of the two courses was pursued. It is perfectly possible for a witness to be certain of the ultimate fact and yet to have forgotten the intermediate facts upon which that ultimate fact was based.

Here we have a power of attorney properly executed for the purpose of selling, among other lots, this real estate in question, and a state of circumstances which fairly shows that

it was for the benefit and interest of the principal that such real estate should be sold at the time the sale in fact occurred; we have also the principal's receipt of her share of the purchase money in 1865, with full knowledge of all the facts, and her acquiescence in and approval of the action of her attorney up to the time of her death in February, 1881. Upon these facts, we think it clear that the instrument executed by the attorney in fact was as valid and effectual as if no war had intervened. The ratification of the act of the attorney was full and complete. It recognized and assented to the continued existence of the agency. The purchase money for the land was received by the principal, and to permit her heirs after her death to repudiate the transaction on the ground that the power of attorney had been revoked would be at war with every principle of equity and fair dealing. This principle applies as strongly in the case of a married woman as in any other, and it will not permit her or, upon her death, her heirs at law to repudiate a transaction the benefits of which she received with full knowledge of the circumstances attending it, and yet claim to recover an estate which had been sold with her authority and the purchase money for which had been paid to her. *Bein* v. *Heath*, 6 How. 228, 247; *Bank* v. *Partee*, 99 U. S. 325, 329. *Bedford* v. *Burton*, 106 U. S. 338, considers generally the obligation of married women to do equity under circumstances somewhat similar in principle to the present case.

Nor does the act of Congress of July 17, 1862, c. 189, 12 Stat. 589, to suppress insurrection, etc., have any effect upon the sales, transfers or conveyance of the estate and property of persons in rebellion after September 23, 1862, except as to the United States. As against that Government, the transfers of property liable to seizure were null and void; they were not void as between private parties or against any other party than the United States. *Conrad* v. *Waples*, 96 U. S. 279, 288.

(3.) Even though the power of attorney were valid and had not been revoked by the war, it is objected that the instrument executed by the attorney in fact conveyed no title, but at best was a mere contract of sale; and,

(4.) That this objection is not cured by the act of Congress, above set forth.

These two questions may be considered together; and it makes no difference in the result whether the instrument be construed as conveying a legal title, or an equitable title only.

Some of the justices of this court concur in opinion with the Court of Appeals that, taking all the provisions of the instrument together, it did not amount to a deed of conveyance, but only to an agreement to convey made by an attorney who was authorized by his power to make a conveyance. In that aspect of the case, the instrument would convey an equitable title, which would afford a 'good defence to this bill; and it would be unnecessary to invoke the curative act of Congress.

But a majority of this court is of opinion that the instrument was in the nature of a conveyance of the legal title, though defectively executed, and that it came within the provisions of the act, and the defect was thereby cured.

We agree generally that although there are words of conveyance *in præsenti* in a contract for the purchase and sale of lands, still, if from the whole instrument it is manifest that further conveyances were contemplated by the parties, it will be considered an agreement to convey and not a conveyance. The whole question is one of intention to be gathered from the instrument itself. *Jackson* v. *Moncrief,* 5 Wend. 26; *Ogden* v. *Brown,* 33 Penn. St. 247; *Phillips* v. *Swank,* 120 Penn. St. 76.

Looking at the instrument executed by the attorney it will be seen that he refers to and annexes the power of attorney executed to him by Robert Ransom, Jr., and Mrs. Ransom, his wife, states the consideration received by him from Mr. Tayloe, acknowledges its receipt, and then acknowledges that he has " bargained and sold to Mr. B. O. Tayloe, his heirs and assigns, all the right, title and estate of them, the said Robert Ransom, Jr., and Mary Ransom, being one undivided third part of, in and to " the various pieces of ground, including the ground in question, and then adds, " with the improvements and appurtenances." Stopping here,

and construing the language of the instrument, there can be no question that it was executed as a conveyance of the interest of the principals in the land, and was intended as such by the attorney in fact. Although the instrument shows an intention on the part of the attorney to convey the title of his principals, yet, instead of signing their names by himself as attorney, he signs his own name, preceding the signature with the statement " In testimony whereof, I have hereunto set my hand and seal this 29th day of November, 1864." This is one of the defective executions of an instrument under a power of attorney, spoken of in the act of congress. It is alleged, however, that the following language, which appears at the end of the instrument executed by Huntt, changes the character of that instrument, and shows that it was not intended as a conveyance but as a simple contract of sale. The language referred to comes immediately after the words " with the improvements and appurtenances," and is as follows : " And I hereby further agree in behalf of said Robert and Mary Ransom, that they shall and will, as soon as convenient, make and execute a proper deed of conveyance of said premises to said Benjamin O. Tayloe in fee simple."

We do not think this language changes the effect of the prior portion of the instrument, nor does it show that the intention of the person executing it was simply to enter into a contract of sale. He is the only one who signs it. The instrument shows that he is executing it as an attorney in fact and by virtue of the power of attorney annexed to the instrument. Although he assumes therein to bargain and sell (in legal effect to convey) to Mr. Tayloe, his heirs and assigns, all the right, title and estate of his principals, being a one undivided third part of the real estate in question, yet he also agrees in the same instrument, in addition to the conveyance by himself of the title of his principals, to also obtain from them a deed of the same premises. This portion of the instrument is a contract in the nature of a covenant for further assurance. It may well be that the grantee, Mr. Tayloe, while taking the conveyance from the attorney in fact, and paying the full consideration for the land, would also desire to obtain

a deed conveying the same title and executed by the parties in person. This desire may easily be understood even upon the assumption that the instrument executed by virtue of the power of attorney was intended to convey the title. Such a deed would remove all possible question which could, in any event, arise based upon the fact that the conveyance was executed by an attorney instead of by a principal. The agreement to obtain a conveyance from his principals is entirely consistent with the prior portion of the instrument in which the attorney assumes to convey the title by virtue of the power of attorney which he annexes. If the attorney had, instead of agreeing on behalf of his principals that they should make and execute a proper deed of conveyance of the premises, agreed that he would himself at some future time make such a deed, a different question would be presented; for in that case, taking the whole instrument together, it might be argued that there was no intention at that time to convey the title. But, where, in addition to conveying the title himself by apt words, clearly expressed, he simply agrees to also procure a proper deed from his principals at some future time, there is nothing inconsistent in that agreement with the intention to himself convey the title by virtue of the power. Nor do we regard the fact as material upon this latter point that in the acknowledgment of the instrument in question, taken by two aldermen who were *ex officio* justices of the peace, they describe the instrument as a certain contract of sale, and certify that "Mr. Huntt executed said contract and acknowledged the same to be his act and deed." What the aldermen may have regarded as the legal effect of the instrument is not of much importance, and whether they described it as a contract of sale or as a conveyance cannot alter the character of the paper itself or its legal effect.

Being of opinion that the paper was in the nature of a conveyance, we also think that the defective execution of the instrument was cured by the act of Congress. This instrument was executed by the attorney in fact, who acknowledged the same to be his act and deed instead of the act and deed of his principals, and the act of Congress provides that in such case

the deed shall have the same effect as if such attorney in fact had acknowledged the deed to be the deed of the grantors (his principals). One or two other defects existed of a like nature, that is, of a nature which might be cured by a legislative act, and which were cured by the act in question.

The statute applies where the parties intended to convey, thought they had conveyed, and yet had not complied with the requisites necessary to make the conveyance in all things effective. In such case, especially where the consideration for the instrument has been received and retained, curative statutes may be passed which give validity to the defective instruments to the same extent as was intended by the parties at the time when they were executed. *Watson* v. *Mercer*, 8 Pet. 88, 110; *Randall* v. *Kreiger*, 23 Wall. 137.

The chief objection to the act, assuming that the instrument was a conveyance, is that it does not apply in this case as plaintiffs urge, because at the time when the act was passed the parties claiming through this deed were not, as plaintiffs contend, in the actual possession of the land covered by it. The statute declares the instrument is to have effect and validity to pass the fee simple to the estate intended to be conveyed and to bar dower in the real estate therein mentioned "in favor of parties in actual possession, claiming under and through such deeds." It is said that this limitation to the parties in actual possession refers to the time when the act was passed, and if the parties claiming under the deed were not at that time in actual possession of the premises, the statute has no application to them. We think the act applies if at the time when it was passed the parties claiming under the defective instrument were in actual possession of the land, and that the act also applies if the parties claiming under such instrument were not in actual possession at the time of its passage, but subsequently came into such possession. The act cured the defects in the instrument mentioned therein, if when it passed the parties were in actual possession, claiming under such instruments; and if thereafter ousted they could still claim the benefit of the act even in an attempt to regain possession. If not in actual possession

when the act was passed, they could not have the benefit thereof in an attempt to obtain possession thereafter. But if thereafter they were in actual possession, they could defend that possession under the act, so far as their title depended upon defective instruments existing at the time when the act was passed and which were of a character covered by its terms.

We think this is a fair construction of the act, and that it ought to be liberally construed for the purpose of obtaining the benefits it was clearly intended to give in the case of a defective execution of otherwise valid instruments. This view renders it unnecessary to decide as to the validity of the objection that these defendants were not in actual possession when the act was passed. We do not decide whether they were or not. They were in actual and undisturbed possession at the commencement of this suit, and they can avail themselves of the act to protect such possession and their title under the deed in question.

(5.) The fifth objection taken we have already answered in holding that Mrs. Ransom did, in fact, receive the purchase price of her share in the land with full knowledge that it was such purchase price, and thereby ratified and confirmed the act of her attorney.

By this disposition of the whole case upon the merits we are not to be considered as deciding that parties situated as the plaintiffs were in this case, out of possession, can maintain an action for partition. We have not discussed that question, and do not decide it, because it was unnecessary on account of the views we have stated in relation to the other aspects of the case.

We are of opinion that the complainants have failed to make out a cause of action, and the judgment dismissing the bill must, therefore, be

*Affirmed.*

MR. JUSTICE WHITE did not sit in this case and took no part in its decision.