SPRINGER v. GARVAN, Alien Property Custodian, et al.

(District Court, S. D. Ohio, W. D.   June 19, 1920.)

No. 194.

1. War ⏀⟶10 (1)—Contract not invalid by reason of declaration of war.

A contract by parents, who were German subjects, made on leaving the United States before this country entered the war, for the care of their children who were left in the United States, *held* valid, and not abrogated by the subsequent declaration of war with Germany.

2. War ⏀⟶12—Debts enforceable against assets of alien enemy.

Debts enforceable against the assets of an alien enemy under Trading with the Enemy Act Oct. 6, 1917, § 9, as amended by Act July 11, 1919, include all valid obligations whenever created or accrued, and are not limited to those existing when the statute was enacted.

On Final Hearing.

3. War ⏀⟶12—Debt arising from performance of contract with alien enemy after passage of Trading with Enemy Act not enforceable against assets.

An indebtedness arising out of the performance of an executory contract between an American citizen and a German subject who afterward became an alien enemy *held* recoverable from property in the hands of the Alien Property Custodian so far as based on performance before enactment of Trading with the Enemy Act Oct. 6, 1917 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115½a–3115½j), but not so far as based on continued performance thereafter, which was made unlawful by section 3, except under license from the President.

In Equity.   Suit by Alfred Springer against Francis P. Garvan, Alien Property Custodian, and another.   Decree for complainant.

Moulinier, Bettman & Hunt and Albert W. Schwartz, all of Cincinnati, Ohio, for plaintiff.

⏀⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

R. T. Dickerson, Asst. U. S. Atty., of Cincinnati, Ohio, and Dean H. Stanley, Sp. Asst. Atty. Gen.

## On Motion to Determine Points of Law Before Final Hearing.

PECK, District Judge. This action is brought under favor of section 9 of the Trading with the Enemy Act, as amended July 11, 1919 (41 Stat. 35, c. 6), and seeks to enforce as against seized assets of Christion Meyer and Elsa S. Meyer, his wife, German alien enemies, certain claims, among others, for support and maintenance of their children in the United States, furnished by plaintiff during the war, both before and after the passage of said act October 6, 1917, while the said parents were in Germany, pursuant to a contract made by plaintiff with the parents at the time of their departure from the United States before the war.

[1] The contract alleged bears analogy to that of a prisoner of war for support in enemy country generally held valid (Crawford v. The William Penn, Fed. Cas. No. 3,373, opinion by Mr. Justice Washington), and involved in its performance neither communication nor commerce with, nor benefit to, the enemy, and was not, therefore, abrogated by the declaration of war with Germany April 6, 1917. Williams v. Paine, 169 U. S. 55, 18 Sup. Ct. 279, 42 L. Ed. 658; Kershaw v. Kelsey, 100 Mass. 561, 97 Am. Dec. 124, 1 Am. Rep. 142; Tingley v. Muller, [1917] 2 L. R. Ch. Div. 144; Huberich on Trading with the Enemy, pp. 99, 100; Trotter on Law of Contract During and After War, pp. 37, 61.

[2] The debt which any person not an enemy or ally of an enemy may collect as against the assets of his alien enemy debtor, under amended section 9 aforesaid, need not have existed at the time of the enactment thereof. The term refers, by the common meaning of the language used, to all valid obligations whenever created or accrued; otherwise indebtedness created by license of the President (section 5a) subsequent to the enactment might be without means of enforcement.

The question whether so much of the debt as accrued after the date of the passage of said act is within the inhibition thereof, which forbids, inter alia, carrying on, completing, or performing any contract, agreement, or obligation except by license of the President, directly or indirectly with, for, or on account of an enemy, is reserved for consideration upon final hearing, when the facts will be more fully before the court.

## On Final Hearing.

[3] By the bill complainant avers that his daughter, Elsa Springer Meyer, and her husband, Christian Meyer, are indebted to him in the sum of $10,276.76, and that his indebtedness arose in the following manner: Christian Meyer is a citizen of Germany. He and his wife lived in Cincinnati prior to the European War, and on the 28th of June, 1914, went to Germany for a visit, taking one child with them and leaving their two youngest children in charge of the complainant. Before leaving they agreed to reimburse the complainant for all money which he should send them (Meyer and his wife) or expend for their

support, maintenance, or expenses while in Europe, and for such sums as he should spend in the care and support of the children and their governess, as well as the wages of the latter. After the breaking out of the European War, and before the United States entered the war, he sent Mrs. Meyer sums aggregating $3,000 and boarded the children and their governess for 15 months, for which he ·charges $1,350. He expended $1,000 to take them to Germany to see their parents and bring them back in the fall of 1916 and winter of 1917, and expended the sum of $2,385.53 in boarding them and their governess at a hotel in Cincinnati after their return, and paid their governess $1,333.33 as wages. After the declaration of war by the United States he expended the further sum of $871.23 for board at the hotel and $266.61 for the governess' wages. Christian Meyer and his wife were enemies within the presidential proclamation, and the Alien Property Custodian seized certain securities and cash belonging to them. Complainant filed his claim with the Alien Property Custodian and an application for the transfer to him of the property, which amounted in all to about $9,500 in value and less than the amount of his claim. Christian Meyer and his wife assented in writing to the allowance of the claim. The Attorney General, entertaining doubts as to the validity of the claim, disallowed it. Complainant prays for the allowance of his claim against the property in the hands of the Alien Property Custodian and Treasurer of the United States, for the payment of the sum, and the transfer to him of the securities held. Christian Meyer and his wife, by a joint answer, admit the indebtedness and consent to the granting of the relief prayed. The Alien Property Custodian pleads want of knowledge and demands strict proof of the facts relating to the existence of the debt.

On complainant's motion to dispose of questions of law before trial it has heretofore been determined that the debt for the support furnished the children after declaration of war by the United States, and prior to the passage of the Trading with the Enemy Act, October 6, 1917, was not one that was invalid on .account of the state of war, by the common law. ·

The evidence offered by the plaintiff tends in general to support the allegations of the bill. When Meyer and his wife went to Europe it was with the intention of returning in two months. They made an oral agreement with the complainant, all three parties being present, that inasmuch as they intended to go abroad and stay a short time, any expenditures the complainant should have in connection with the two children to be left with him, or any remittances he should make to Meyer and his wife Meyer would reimburse, saying he had money at the ·Central Trust Company. Complainant exacted no written agreement, as he knew Meyer was financially good. Mr. and Mrs. Meyer pledged themselves that in all things he should be reimbursed. Meyer and his wife had not lived with the complainant, but maintained a home of their own. Complainant took the children to his home and kept them and their governess there until the 1st of October, 1915, when ' the entire family moved to a residential hotel, which was within the means of the parties. The charges there were reasonable, and the

governess was paid a reasonable wage, from $8 to $9 a week. Meyer, being a German citizen and a reserve officer in the German navy, was held to service in Germany. In November, 1916, the complainant took the two children to Germany in order that their mother might see them, she being greatly distressed and suffering in health on account of the separation. Upon arrival in Germany complainant was again told by his daughter and son-in-law that he should be reimbursed for his outlays. The trip cost about $4,000, of which he charged one-fourth, as the children's expense, against Meyer and his wife. Complainant brought the youngest child, a mere baby, back home, leaving two children with the parents, deeming the conditions in Germany with regard to food supply at that time not such as to warrant leaving the youngest. Complainant continued to support this child and the governess. While Meyer and his wife gave complainant power of attorney to enter their safe deposit box in the bank at Cincinnati, he was not given power to reimburse himself. The remittances made them were necessary for their support.

The government offered no evidence except an inventory of the property seized by the Alien Property Custodian.

The following conclusions are reached:

The evidence sufficiently shows that there was a contract to reimburse for remittances and all outlays made on account of the children. While this conclusion rests upon the testimony of complainant alone, it is uncontradicted, the witness is unimpeached, his testimony is not improbable, but, on the other hand, is convincing. The contract, however, must be taken as he has stated it. He has stated merely that he was to be reimbursed for outlays made on behalf of the children and remittances sent to the parents. His grandchildren came to his house for a two months' stay while their parents went to Europe. I am unable to conclude that the intent of the agreement was that he should charge, and they should pay, board for the keep of the children while they were guests in his house. I take it that the contract related rather to direct outlays, expenditures, and advancements of money. Such were its terms as testified to by complainant. Complainant can take nothing on the theory of implied contract. He was dealing with his daughter and his son-in-law. The succor which they received at his hands will be attributed to parental generosity unless an express contract to repay be shown. And, as defendants stand in a position similar to that of an administrator defending the estate of a decedent against such a claim, complainant must establish the contract by evidence that is clear and convincing. Hinkle v. Sage, 67 Ohio St. 256, 65 N. E. 999, as modified by Merrick v. Ditzler, 91 Ohio St. 256, 266, 110 N. E. 493. And the same rule that requires that the evidence in cases of this kind should be clear and convincing would require that the contract should be strictly limited to, and not be extended beyond its clear purport and intent. The same ruling will apply to board furnished the governess at the complainant's house.

It is found that the outlays for the board of the children and governess at the hotel, money advanced, and wages paid to the governess prior to the entry of the United States into the World War were direct

cash outlays for which the complainant is entitled to reimbursement in accordance with the terms of the contract.

By the contract complainant was to keep and maintain the children until the return of the parents. While his daughter was in Europe she asked to have the children sent over by a trustworthy person. Pursuant to this request he himself took them abroad; his daughter being in ignorance of his coming until he arrived. The transportation of the children so requested necessitated an expenditure of money which came within the terms of the contract to reimburse for all outlays. One-fourth of the total expense of the trip was certainly not an unreasonable portion to charge against the parents. The item is allowed.

That portion of the complainant's claim resulting from performance of the contract after the passage of Trading with the Enemy Act Oct. 6, 1917 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115½a–3115½j) must be disallowed. By section 3 of the act it was made unlawful for any person to trade with or on behalf of an enemy except by license of the President; and complainant has shown no license. By section 2 "trade" is defined to mean, among other things, to pay or satisfy a debt or obligation; to carry on, complete, or perform any contract, agreement, or obligation. By section 5 the President was given authority to grant licenses to trade, notwithstanding the provisions of section 3. The complainant contends, despite the breadth of the definition contained in the act, that the contracts thereby prohibited are only those which would have been invalid at common law between citizens of this and an enemy country, which were, generally speaking, those which involved intercourse or communication, and those which might tend to better the enemy's economic position or be detrimental to this country, and in certain other exceptional instances. Trotter on Law of Contract During and After War, p. 61, § 13. The general principles are stated, and the cases up to that time thoroughly reviewed in Kershaw v. Kelsey, 100 Mass. 561, 97 Am. Dec. 124, 1 Am. Rep. 142, which is cited with approval in Williams v. Paine, 169 U. S. at page 72, 18 Sup. Ct. 279, 42 L. Ed. 658. Both of those cases arose during the Civil War. In the first it was held that a lease between a citizen of Mississippi and a citizen of Massachusetts residing in Mississippi, made during the war and involving neither intercourse nor trade across the line of hostilities, was valid, and in the other that a power of attorney, executed before the war by one thereafter who became an enemy to one who remained a loyal citizen continued valid. But there is a vast difference between the terms of the act then in force, which simply forbade "all commercial intercourse" during hostilities (12 Stat. 257; and see presidential proclamation, 13 Stat. 731) and that now under consideration. The broadest and most comprehensive language is used to define the words "to trade," and there is no suggestion anywhere in the act of any limitation on their scope except that of presidential license. Congress evidently considered such power an ample substitute for the exceptions to the rule at common law. The language used does not indicate that it was the intention merely to declare the common law with reference to the character of trade interdicted. As the act contains no ambiguity, it is not within

the province of the court to ingraft exceptions upon it by construction. Therefore so much of this claim as accrued subsequent to the date of the passage of the act cannot be allowed.

In view of the foregoing, it becomes unnecessary to determine what the effect of the amendment of section 9 by the act dated June 5, 1920 (41 Stat. 977, c. 241), may be upon this portion of complainant's claim.

A decree may be taken subjecting the property of both defendants to be sold as upon execution, the claim to be first made out of the property of the husband as far as can be, because he was primarily, and as between the husband and wife, liable for the children's and wife's support.