LEONARD ALDRIDGE,

*vs.*

FRANCO-WYOMING SECURITIES CORPORATION, a corporation of the State of Delaware, WILLIAM D. WALTMAN, DAVID B. TRAMMELL, LESTER S. GRANT, and HERMAN S. BRISCOE.

*New Castle, March 26, 1943.*

*Aaron Finger,* of the firm of Richards, Layton & Finger, and *Richard J. Cronan* and *Samuel Duker,* of the firm of Kaufman & Cronan, of New York City, for petitioner.

*Clarence A. Southerland* and *E. Ennalls Berl,* of the firm of Southerland, Berl & Potter, for respondents.

PEARSON, Vice-Chancellor: The validity of the election of directors at the 1942 stockholders' meeting depends upon whether the attempted voting of certain proxies was lawful. These proxies were signed by French shareholders who

were residents of "occupied France",[1] mailed to respondent Waltman, and received by him in California, prior to the outbreak of the war between the United States and Germany on December 11, 1941. The proxies were not dated and did not designate the persons who should exercise the authority to vote. Waltman filled in the spaces for the date and names of proxy holders, and voted upon the proxies for the election of the individual respondents as directors. Petitioner contends that these votes should not be counted. He argues (1) that at the time of the meeting, the French shareholders were "enemies" within the meaning of the *Trading With the Enemy Act,* 40 *Statutes at Large* 411, 50 *U.S.C.A. Appendix,* § 1, *et seq.*; (2) that the completion of the proxies by dating them and filling in the names of the proxy holders was illegal as trade with the enemy, within the provisions of the Act; (3) that the exercise of the voting rights which the proxies purported to confer was likewise in violation of the Act.

The respondent corporation was organized under the laws of Delaware in 1930. Since then, it has had outstanding 500 shares of $10 par value capital stock. At the date of the meeting, and for some time prior to it, petitioner, a British subject, owned 150 shares. Respondent Waltman owned 10 shares. The remaining 340 shares were owned by French citizens; Henri Louis Gaillochet, 150 shares; his son, Louis, 50 shares; his son, Roger, 40 shares; and four close business associates, a total of 100 shares.

Waltman is a native born citizen and resident of the United States, an engineer by profession, and has been a

---

[1] The following meanings, stipulated by the parties, will be adopted here: "Occupied France" refers to that part of France occupied after the Armistice of June 1940 by the military and naval forces of the German Reich, or the Kingdom of Italy; "Unoccupied France" refers to that part of France remaining under the control of the French authorities after June 1940, and not occupied by the military and naval forces of the German Reich, or the Kingdom of Italy until November 1942, when all of the continental territory of France was so occupied.

director and president of the corporation since its organization. For upwards of fifteen years prior to the 1942 meeting, he had represented the interests in the United States of Gaillochet Sr. and his group of business associates. At the stockholders' meeting of March 4, 1941, Waltman voted upon proxies for the 340 shares of the French shareholders, together with his own 10 shares; and the votes thus cast determined the election of directors that year. After the 1941 meeting, Waltman wrote to Gaillochet Sr. suggesting that proxies be furnished him by the French stockholders to be used in succeeding years. On June 20, 1941, Waltman received in the regular course of the United States mails, in an envelope mailed from Lyon (unoccupied France) on April 28, 1941, separate proxies signed by Gaillochet Sr. and his four business associates, representing an aggregate of 250 shares. Each proxy purports to authorize the voting of the shares at the annual or any other stockholders' meetings of the corporation, held during the years 1941, 1942, 1943 and 1944, within three years of the date of the proxy.[2] The proxies were signed in or near Paris, in occupied France, and were taken to unoccupied

---

[2] Omitting the signature and seal of the stockholder, and the witness' name, each proxy reads thus:

"Know All Men by these Presents, that the undersigned, as registered owner of _____ shares of the capital stock of Franco Wyoming Securities Corporation, a corporation organized and existing under the laws of the State of Delaware, does hereby make, constitute and appoint _____ and _____ and each of them, his true and lawful attorneys, agents and proxies, for him and in his name, place and stead to vote upon the said number of shares of capital stock of said corporation owned by the undersigned or standing in his name on the books of the said Corporation, at the annual or any other meetings of the stockholders of the said Franco Wyoming Securities Corporation or at whatever adjournments of such annual or other meetings, whenever the said meeting or meetings may be held during the years 1941, 1942, 1943 and 1944 within three years of the date of this proxy, hereby granting the said attorneys, agents and proxies full power and authority to act for him and in his name at said meeting or meetings, in voting for the election of Directors of the Corporation, and in considering

France by an employee of Gaillochet Sr. or of a company in which he was interested in Lyon.[3]

On June 20, 1941, Waltman also received a duplicate set of proxies of Gaillochet Sr. and his associates mailed from Annemasse (unoccupied France) on April 21, 1941; but since these were not used, no further reference to them will be made.

It will be noted that among the above mentioned proxies, there was none of either of the sons of Gaillochet Sr., Roger and Louis. Both sons had been officers in the French army, and in June, 1940, were made prisoners of war by the Germans. Roger was still in prison at the time of the 1942 stockholders' meeting and gave no proxy. Louis was released in the middle of 1941, in unoccupied France, where, so far as is known to the parties to this cause, he spent most of his time attending to business interests of his father. On November 24, 1941, at Lyon, Louis mailed to Waltman a proxy for his 50 shares. The proxy was received in the regular course of the mail on January 5, 1942, at Waltman's office in Los Angeles, California. The proxy is in substantially the same form as those given by Gaillochet Sr. and

---

and voting upon all other business which may properly come before such meetings, include all matters set forth or referred to in the notice of said meetings, as fully as the undersigned could do if personally present, hereby granting the said attorneys and proxies full power of substitution and revocation, and hereby ratifying and confirming all that said attorneys and proxies or their substitutes may do in the name, place and stead of the undersigned.

"In Witness Whereof, the undersigned has hereunto set his hand and seal this         day of         ."

[3] Pursuant to the request of Gaillochet Sr., communications for him or his business associates were addressed in care of this employee in Lyon.

In the stipulation of the parties, it is agreed that "During the whole of the year 1941 it was possible for persons residing in occupied France having legitimate business interests in unoccupied France and who were known to abstain from all political agitation to obtain permission from the necessary German military and French civil authorities to enter unoccupied France to conduct their business there."

his four business associates, except that when received it bore the date, November 24, 1941.

At the meeting on March 3, 1942, Waltman inserted in all of the proxies, in blank spaces provided, his own name and the name of one Sidney Bacharach as the proxy holders. He also inserted in the proxies of Gaillochet Sr. and his four associates the date, November 24, 1941, which was the same date appearing on the proxy of Louis Gaillochet when it was received. Waltman presented all of the proxies to the meeting, and voted upon them (representing 300 shares) and voted in person with respect to his own 10 shares in favor of the individual respondents. They are all native born, resident American citizens, and have been associated with the company for some time. Petitioner was represented at the meeting by an attorney in fact. The latter challenged the validity of the proxies and the voting upon them by Waltman, and voted petitioner's 150 shares in favor of another group. The objections and protests on behalf of petitioner were overruled, and the individual respondents declared to be duly elected directors.

The fact that Louis Gaillochet spent most of his time in unoccupied France, and the further fact that his proxy was not received by Waltman until after the declaration of war, differentiate the situation and the possible problems concerning his proxy from those relating to the other proxies. Since the validity of the election of directors and the main questions presented may be determined without reference to Louis' proxy, I shall not pass upon the validity of the vote based upon it, but shall disregard it and consider only those matters which relate to the proxies for 250 shares of Gaillochet Sr. and his business associates. These gentlemen will be called the five French shareholders.

*Section 2 of the Trading with the Enemy Act* defines "enemy" as

"Any individual, * * * of any nationality, resident within the territory (including that occupied by the military and naval forces)

of any nation with which the United States is at war, or resident out-side the United States and doing business within such territory, * * *."

All of the five French shareholders resided or carried on business, in or near Paris, in occupied France. Accordingly, petitioner correctly contends that when war was declared, they became "enemies" within the statutory definition.

He next contends that the acts of filling in the blanks in the proxies, and voting upon them, were forbidden by the statute. He says that these acts fall within the two following definitions of "to trade" contained in *Section* 2:

"(c) Enter into, carry on, complete, or perform any contract, agreement, or obligation. * * *

"(e) To have any form of business or commercial communication or intercourse with."

He further relies on *Section* 3(*a*) as prohibiting the acts complained of. This Section declares it unlawful:

"For any person in the United States, except with the license of the President, * * * to trade, or attempt to trade, either directly or indirectly, with, to, or from, or for, or on account of, or on behalf of, or for the benefit of, any other person, with knowledge or reasonable cause to believe that such other person is an enemy or ally of enemy, or is conducting or taking part in such trade, directly or indirectly, for, or on account of, or on behalf of, or for the benefit of, an enemy or ally of enemy."

Much of the discussion which follows is equally applicable to the acts of making insertions in the proxies, and of attempting to exercise the voting rights they purport to confer. Notwithstanding the interdependence of the questions to which each class of acts gives rise, the insertions, on the one hand, and the voting, on the other, require some separate treatment. Our examination will first be made with particular reference to the voting, leaving for later the contentions which uniquely concern the insertions.

The sections of the statute, relied on by petitioner, do not expressly or specifically forbid the exercise of a proxy to vote shares of stock, or the exercise of any other power

of attorney, given prior to the outbreak of war to a resident American, by a person who, upon the declaration of war, becomes an "enemy" as defined in the Act. Whether the terms used to describe what was sought to be prohibited should be construed so as to effect a suspension of the operation of such a proxy or power, as petitioner contends, will be considered in the light of the law enunciated in cases decided before and after the passage of the Act, the broad purpose of the Act, other provisions contained in it, and executive orders and regulations authorized by it.

Since the case of *Brown v. United States*, 8 *Cranch* 110, 3 *L. Ed.* 504, it has been the unquestioned law in this country that "war gives the right to confiscate, but does not itself confiscate the property of the enemy". 8 *Cranch* 125, 3 *L. Ed.* 504. Furthermore, "Private rights and duties are affected by war only so far as they are incompatible with the rights of war." *Sutherland v. Mayer*, 271 *U.S.* 272, 288, 46 *S. Ct.* 538, 540, 70 *L. Ed.* 943.

It has long been held that a state of war does not necessarily terminate or suspend a resident agent's power or authority, conferred prior to the outbreak of war by a person who, because of the war, acquires the status of a nonresident enemy. *Conn, et al., v. Penn, et al.,* 6 *Fed. Cas. p.* 282, *No.* 3104; *Williams v. Paine*, 169 *U.S.* 55, 18 *S. Ct.* 279, 42 *L. Ed.* 658; *Sutherland v. Mayer, supra; Second Russian Ins. Co. v. Miller*, 268 *U.S.* 552, 45 *S. Ct.* 593, 69 *L. Ed.* 1088; *Monsseaux v. Urquhart*, 19 *La. Ann.* 482; *Tingley v. Muller, L.R.* [1917] 2 *Ch.* 144; 1 *Restatement of the Law of Agency,* § 115, *Comment c.* In *Williams v. Paine, supra,* the court said, 169 *U.S. at pages* 73 and 74, 18 *S. Ct. at page* 286, 42 *L. Ed.* 658:

"It is entirely plain, as we think, that the mere fact of the breaking out of a war does not necessarily and as a matter of law revoke every agency. Whether it is revoked or not depends upon the circumstances surrounding the case and the nature and character of the agency."

In *Sutherland v. Mayer, supra,* 271 *U.S. at page* 288, 46 *S. Ct. at page* 540, 70 *L. Ed.* 943, the court said:

"Agencies, created before the war, and not requiring intercourse across the enemy's frontier, such as for the collection of debts, preservation of property, and so forth, are not terminated by war."

The case of *Monsseaux v. Urquhart, supra,* was a proceeding by *quo warranto* to test the validity of the election of the defendants as directors of a corporation. The case depended upon whether one Gagnet should have been allowed to vote upon proxies for shares of stock belonging to residents of Pennsylvania and New York. The proxies were given prior to the Civil War, and Gagnet had voted upon them ever since the year 1859. The election in dispute was apparently held in 1867. At pages 485 and 486, of 19 *La. Ann.,* the court said:

"It is, however, confidently maintained by the plaintiffs, that Gagnet's agency, having been created prior to the late civil war, the occurrence of that war had the effect of dissolving his agency, inasmuch as his principals resided in the North. * * *

"Conceding the application of the doctrine, with reference to commercial partnerships, to the belligerent parties in the late civil war, is it true that that war did have the effect of putting an end to the agency conferred upon an individual residing here by a party residing in one of the Northern States? We do not perceive any such analogy between commercial partnerships and agencies of the kind now under consideration, as to induce us to hold that war would, for the same reasons, put an end to both. The continuance of commercial partnership between residents of the belligerent countries would require or encourage active communication or locomotive intercourse between individuals of the belligerent States—intercourse inconsistent with actual hostility, and might foster the resources or increase the comforts of the army. But could, for instance, an agent intrusted with the management of the real estate here of his principal, residing in a country at war with this, be authorized to consider his agency at an end, and abandon the management of the property intrusted to him, on the pretense that the war had freed him from his obligation as agent? Such a doctrine can be sanctioned neither on principle nor authority."

After referring to several cases the court concluded, 19 *La. Ann. at page* 487:

"It is clear then, from these authorities, that the agency of Gagnet was not, as supposed by counsel for the plaintiffs, dissolved, or even suspended by the occurrence of the late war."

The above authorities indicate certain characteristics which agencies must have in order not to be terminated or suspended by the event of war. These seem of equal rank of importance. Of course, the acts authorized must be of such character that they would be unobjectionable if the principal were not an enemy. The agency, or doing of the acts authorized, must not require and must not be attended by communication or intercourse, direct or indirect, with an enemy. The circumstances must disclose the principal's assent, express or implied, to the continuance of the authority upon the occurrence of war. As to this, "where it is the manifest interest of the principal that the agency, constituted before the war, should continue, the assent of the principal will be presumed." *Williams v. Paine, supra,* 169 *U.S. at page* 73, 18 *S. Ct. at page* 286, 42 *L. Ed.* 658.

The proposition that agencies having these requisites are not suspended by the occurrence of war is supported by expressions of the Supreme Court of the United States in cases decided before as well as after the enactment of the *Trading With the Enemy Act.* In the latter category are *Sutherland v. Mayer, supra* and *Second Russian Ins. Co. v. Miller, supra.* Plainly, the express prohibitions of the Act need not be limited or restrained in order to allow the operation of the pre-existing rule concerning agencies.

To sustain his contention that "the voting of enemy-owned shares was intended to be outlawed" by the Act, petitioner cites no American case but relies strongly upon *Robson v. Premier Oil and Pipe Line Company, Ltd., L.R.* [1915] 2 *Ch.* 124. There, a branch of a German bank operating under a limited license in England during the last war, attempted to give a proxy to a British subject to vote shares in an English corporation. The lower court and the Court of Appeals held that votes under the proxies at a

stockholders' meeting were properly rejected. The opinion of the Court of Appeals shows that such voting was considered to be intercourse inconsistent with the state of war, and a prohibited commercial transaction. The case is fundamentally distinguishable from the instant one. There, an alien enemy attempted to give a proxy during the existence of war, not before, as here. Despite certain broad language, it does not seem to me that either the lower or appellate court had in mind the situation of the present case.

The distinction becomes even more apparent when the case of *Tingley v. Muller, L.R.* [1917] 2 *Ch.* 144, is considered. A German living in England was permitted to return to Germany during the last war. Before leaving, he empowered an agent to sell his house and furniture in England, and meanwhile, generally to manage the premises. After the principal had returned to Germany, the agent entered into a contract of sale, pursuant to the power. The purchaser later refused to proceed with the contract on the grounds that the agent's authority had terminated, and that the contract was a transaction prohibited at common law, and by the *British Trading With the Enemy Act*, and proclamations made under it which forbade residents "to enter into any commercial, financial or other contract or obligation with or for the benefit of an enemy." The court (with one dissent) held that the agent's authority continued, and that the contract was valid. In the reasoning of the majority of the court, stress is laid upon the facts that neither the making nor completion of the contract necessitated any intercourse with the enemy principal, that the money paid for the property would not be remitted to him, and that he would obtain no benefit from it during the war. Swinfen Eady, L. J., in denying that the contract was entered into "with an enemy" within the meaning of the proclamation, said at page 160:

"It is not the case of a person who, being an enemy and while he is such, purports to confer an authority on some one here."

Petitioner insists that the broad purpose of the American Act dictates a construction of its prohibitions so as to forbid the continuance of the authority conferred by the proxies involved here. An apt statement in this connection is found in the opinion in *Drewry v. Onassis*, 39 *N. Y. S. 2d* 688, 694:

> "While the definition of the *Trading With the Enemy Act* is inexorable, the purpose of the Act must be kept in sight. It has a rationale. The Act is designed to prohibit and prevent the lending of aid and comfort to the enemy by frustrating the enemy's attempt to garner sinews of war. Confiscation of property was not the objective. Whatever hampers our war effort is the target."

In the instant case, when the proxies of the five French shareholders were executed, transmitted, and received, the United States was not engaged in war. At least for some time after the receipt of the proxies, they were valid beyond dispute; and the acts authorized would now be unobjectionable if the principals were not "enemies". The voting upon the proxies involved no communication with an "enemy", directly or indirectly. That the authority conferred was intended to continue in the event of war is apparent from the circumstances surrounding the execution of the proxies; from the fact that they purport to be operative at all meetings of stockholders during the years 1941 to 1944 inclusive; and from the fact that it would seem *prima facie* beneficial to the shareholders who gave the proxies, to leave the choice of directors in the hands of a person experienced in the affairs of the corporation, long known to and trusted by those shareholders, and selected by them for the purpose, rather than to permit a minority shareholder to exercise a controlling voice.

The circumstances do not justify even a suspicion that anything concerning the proxies, or the voting upon them, has actually operated to the detriment of the United States, or to the advantage of any country with which we are at war. From all that appears, there has been no such result.

Consequently, the contention that voting upon the proxies would be opposed to the purpose of the Act must be based upon the following premises: first, the fact that it would permit control over the management of property, or of a business enterprise in the United States, to be exercised by a person chosen before the war by individuals who subsequently became "enemies" within the meaning of the Act; and second, the argument that such a situation would be dangerous and objectionable in that it might be utilized indirectly to give, or to conceal the giving of, aid to the enemy, or otherwise to hamper our war effort.

Manifestly, the basic situation just described can be created in numerous ways other than by the use of proxies. For example, the situation exists where directors, who continued in office after the declaration of war, were elected before the war by stockholders who later became "enemies". Thus, in the present case, the very situation urged as an objection to the voting of the proxies at the stockholders' meeting, existed prior to that meeting, continuously from the outbreak of the war; for Waltman, the president and only resident director, then in office, had been chosen in time of peace under the authorization of stockholders who thereafter became "enemies".

The question whether such situations are inconsistent with the purpose of the Act finds its answer in the method of dealing with the subjects of enemy owned property and business enterprises in the United States, prescribed by the Act itself and by executive orders and regulations issued under the authority of the Act. These are now part of an "elaborate protective program" (*Ex parte Kumezo Kawato,* 317 *U.S.* 69, 63 *S. Ct.* 115, 120, 87 *L. Ed.* —), designed to meet the many problems which may arise. Under the Trading with the Enemy Act, as it existed during the last war (the Act having been originally adopted in 1917), means were provided for requiring corporations in the United

States to furnish to the Alien Property Custodian[4] lists of enemy officers, directors, and shareholders, and for the reporting of enemy owned property here.[5] Broad powers were conferred upon the President and the Alien Property Custodian to seize such property, including shares of stock.[6]

Prior to our entry in the present war, the Executive Department, under the authority of the Act (by *Ex. Order* 8389, 12 *U.S.C.A.* § 95 *note, and regulations*) ordered a census of all foreign owned property in the United States, requiring corporations to file reports disclosing information with respect to any shares of stock in which any national of any foreign country had an interest on designated dates.[7] These requirements were applicable to respondent corporation and to the stock of all of the French shareholders. By Executive Order 8389, the Department regulated and restricted dealings here in property with which nationals of foreign countries (including France) had some connection.

Upon the declaration of war, *Section* 5 (*b*) of the *Trading With the Enemy Act* was amended by the *First War Powers Act,* 1941, and broad authority was conferred upon the President with relation to property in which any nation-

---

[4] 50 *U. S. C. A. Appendix,* § 6. The office of Alien Property Custodian under the original Act was abolished and the functions and personnel were transferred to the Department of Justice by *Ex. Ord.* 6694, effective March 2, 1935. 50 *U. S. C. A. Appendix,* § 6 *note.*

[5] 50 *U. S. C. A. Appendix,* § 7(*a*).

[6] 50 *U. S. C. A. Appendix,* § 7(*c*).

[7] The President, pursuant to *Sec.* 5(*b*) of the *Trading With the Enemy Act*, empowered the Secretary of the Treasury and the Attorney General, separately or together, to require complete information to be furnished by "any person" relative to any property in which any national of any foreign country had an interest of any nature whatsoever, direct or indirect. *Ex. Ord.* 8389, 12 *U. S. C. A.,* § 95, *note,* 3 *C. F. R.* 1941 *Supp. p.* 225. The Secretary of the Treasury thereupon issued regulations ordering the census of property. 31 *C. F. R.,* §§ 130.1-130.7.

al of any foreign country has an interest.[8] Pursuant to this authority, the President later issued an *Executive Order* establishing the office of Alien Property Custodian and defining its duties and functions.[9] The Alien Property Custodian is granted most comprehensive powers "to take such action as he deems necessary in the national interest" with respect to specified business enterprises and property in the United States; including the express powers "to direct, manage, supervise, control or vest" such enterprises and property. The respondent corporation and the stock of the French shareholders are within the scope of these provisions.

It is highly significant that the seizure of property and the seizure of control of business enterprises occur only as

---

[8] *Act of Dec.* 18, 1941, c. 593, 55 *Stat.* 838, 50 *U. S. C. A. Appendix*, § 616. The Section reads in part:

"(1) During the time of war * * * the President may, through any agency that he may designate, or otherwise, and under such rules and regulations as he may prescribe, by means of instructions, licenses, or otherwise—

"(A) * * *

"(B) investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest,
by any person, or with respect to any property, subject to the jurisdiction of the United States; and any property or interest of any foreign country or national thereof shall vest, when, as, and upon the terms, directed by the President, in such agency or person as may be designated from time to time by the President, and upon such terms and conditions as the President may prescribe such interest or property shall be held, used, administered, liquidated, sold, or otherwise dealt with in the interest of and for the benefit of the United States, and such designated agency or person may perform any and all acts incident to the accomplishment or furtherance of these purposes; * * *."

[9] *Ex. Ord.* 9095, March 11, 1942, 7 *F. R.* 1971, *amended by Ex. Ord.* 9193, July 6, 1942, 50 *U. S. C. A. Appendix*, § 6 *note*, 7 *F. R.* 5205.

the result of action in specific cases taken by the proper executive officer. Compare: *Isenberg v. Trent Trust Co.,* *(9 Cir.)* 26 *F.* 2*d* 609; *Id.,* 9 *(Cir.)* 31 *F.* 2*d* 553, *certiorari* denied 279 *U.S.* 862, 49 *S. Ct.* 479, 73 *L. Ed.* 1001. The mere fact that an "enemy" owns or has an interest in a business enterprise does not require that the enterprise cease operating upon the outbreak of war. The Act and orders and regulations (which became effective before as well as after the stockholders' meeting), indicate a general method of dealing with such property and enterprises. That method is to require the reporting of information about them, and then either to seize them, or to leave them in the custody or charge of the residents who were authorized before the war to manage them, subject always to the supervision and control of the Executive Department. I conclude, therefore, that the exercise of pre-war authorizations to manage property or business enterprises here is not, of itself, inconsistent with the purpose of the Trading with the Enemy Act or with any other part of the "protective program" which has come to my attention.

At the argument, petitioner's solicitor contended that the giving and exercise of the proxies were forbidden by Executive Order 8389.[10] He argues that these acts con-

---

[10] 31 *C. F. R.* 1940 *Supp.* §§ 127.9-127.14. See also *Ex. Ord.* 8785, June 14, 1941, 12 *U. S. C. A.,* § 95 *note,* 3 *C. F. R.* 1941 *Supp. p.* 225, *amending Ex. Ord.* 8389. The pertinent parts read thus: "Section 1. All of the following transactions are prohibited, except as specifically authorized by the Secretary of the Treasury by means of regulations, rulings, instructions, licenses, or otherwise, if (i) such transactions are by, or on behalf of, or pursuant to the direction of any foreign country designated in this Order, or any national thereof, or (ii) such transactions involve property in which any foreign country designated in this Order, or any national thereof, has at any time on or since the effective date of this Order had any interest of any nature whatsoever, direct or indirect: * * *

"E. All transfers, withdrawals or exportations of, or dealings in, any evidences of indebtedness or evidences of ownership of property

stitute "transfers" or "dealings in * * * evidences of owner-ship of property", prohibited by Section 1E; and also con-stitute an "acquisition" or "transfer" of an "interest in" a "security or evidence thereof", prohibited by *Section 2A (2)*. He asserts that a general ruling of April 21, 1942 indicates that the terms of the Executive Order encompass the giving and exercise of the proxies.[11]

This requires but brief comment. A consideration of the order, and rulings under it, makes clear that they are directed to the prevention of acts which, in substance and effect, work a conveyance or disposal of assets, by nationals of foreign countries designated in the order. *Section 2* of the order provides measures for the control of the importa-tion of securities, and has the ultimate purpose stated above. Neither the giving nor the exercise of the proxies effected a conveyance, disposal or importation of the shares of stock, or of the stock certificates which were the evidences of ownership, or of any interest in them or in any other assets. The proxies themselves are not comprehended by the lan-

---

by any person within the United States; * * *.

"Section 2.

"A. All of the following transactions are prohibited, except as specifically authorized by the Secretary of the Treasury by means of regulations, rulings, instructions, licenses, or otherwise: * * *

"(2) The acquisition by, or transfer to, any person within the United States of any interest in any security or evidence thereof if the attendant circumstances disclose or indicate that the security or evidence thereof is not physically situated within the United States."

[11] *Gen. Rul.* 12, April 21, 1942, under *Ex. Ord.* 8389, *as amended,* 7 *F. R.* 2991. Petitioner alludes to the first and part of the fifth para-graphs which are as follows:

"(1) Unless licensed or otherwise authorized by the Secretary of the Treasury, (a) any transfer after the effective date of the Order is null and void to the extent that it is (or was) a transfer of any property in a blocked account at the time of such transfer; and (b) no transfer after the effective date of the Order shall be the basis for the assertion or recognition of any right, remedy, power, or privilege with respect to, or interest in, any property while in a blocked account (ir-

guage of the order, or by its purpose. Hence, petitioner's contention seems wholly untenable.

We come now to the objection concerning the insertions by Waltman of names and dates in the proxies. Petitioner argues that "Until said blanks were filled in the proxies were not powers of attorney, they did not establish an agency; they were of no effect whatsoever." However, petitioner rightly concedes, in effect, that the attendant circumstances were such as to authorize Waltman to fill in the blanks. His position is that: "when the blank proxies were filled in with the names of Messrs. Waltman and Bachrach, such act created a new and different agency: an agency to vote the stock of an enemy. Such an agency could not be created during war; it was illegal both under the common law and the *Trading With the Enemy Act*. It was 'intercourse with the enemy which is forbidden', (*Insurance Co. v. Davis, supra,* [95 *U.S.* 425, 24 *L. Ed.* 453]) and it was in direct violation of *Section* 2 *subdivision* (c)

---

respective of whether such property was in a blocked account at the time of such transfer). * * *

"(5) For the purposes of this general ruling:

"(a) The term 'transfer' shall mean any actual or purported act or transaction, whether or not evidenced by writing, and whether or not done or performed within the United States, the purpose, intent, or effect of which is to create, surrender, release, transfer, or alter, directly or indirectly, any right, remedy, power, privilege, or interest with respect to any property and without limitation upon the foregoing shall include the making, execution, or delivery of any assignment, power, conveyance, check, declaration, deed, deed of trust, power of attorney, power of appointment, bill of sale, mortgage, receipt, agreement, contract, certificate, gift, sale, affidavit, or statement; the creation or transfer of any lien; the issuance, docketing, filing, or the levy of or under any judgment, decree, attachment, execution, or other judicial or administrative process or order, or the service of any garnishment; the acquisition of any interest of any nature whatsoever by reason of a judgment or decree of any foreign country; the fulfillment of any condition, or the exercise of any power of appointment, power of attorney, or other power; provided, however, that the term 'transfer' shall not be deemed to include transfers by operation of law."

of the Act as carrying on or completing 'any contract, agreement, or obligation.' "

This view impresses me as being artificial and fallacious in that it does not reflect what actually happened. Plainly, there was but one delegation of authority by the shareholders, and this was accomplished by the signing of the instruments and the transmission of them to Waltman, following the latter's suggestion to Gaillochet Sr. that this be done. After that, no further action of the shareholders was required, or transpired. What was delegated was the authority to make the insertions, and the authority to vote the shares. Although the persons who might exercise the latter authority were selected in the United States after war had begun, the character and scope of that authority was measured by and depended upon the acts of the shareholders, done long before the war; and there was no communication or intercourse with any one who had become an "enemy". Waltman's act of making the insertions was the exercise of a power, not the completion or carrying out of a contract. In so far as the *Trading With the Enemy Act* is concerned, the exercise of the authority to select directors, and the exercise of the authority to select the persons to vote upon the proxies, were equally unobjectionable.

At the conclusion of the hearing, it did not appear whether the respondent corporation had complied with the regulations under *Executive Order* 8389, by reporting the information called for, particularly the ownership of sixty-eight per cent of the corporation's capital stock by the French shareholders. Petitioner did not raise this question. Nevertheless, in view of the requirements of the regulations, and the importance of the disclosure of such information to the functioning of the "protective program", it seemed to me desirable, if not necessary, before proceeding to adjudge the validity of the vote upon the proxies, first to inquire whether the information had been disclosed. The solicitors were so notified; and the hearing was reopened and evidence adduced by respondents, over petitioner's ob-

jection. From this it appears that pursuant to the regulations, the respondent corporation filed reports on October 21, 1941 and again on December 2, 1941 with the Federal Reserve Bank of San Francisco, an agency authorized to receive such reports. The information reported includes financial statements, a description of the business conducted by respondent, a list of its directors and officers, the names and addresses of its shareholders, and the number of shares held by each. Three of the four directors, and the secretary, treasurer, a vice-president, and an assistant secretary are stated to be citizens and nationals of France and presumably residing in Paris. The address of all of the French shareholders is stated to be in Paris. The ownership of shares as disclosed was the same as at the time of the March 1942 meeting.

Thus, shortly before the outbreak of the war, the Executive Department was informed of the basic facts concerning the interest and control of French nationals with relation to the respondent corporation. The essential requirements of disclosure seem satisfactorily met. This being so, and there being no indication that the exercise of the proxies involved communication with an enemy, or resulted in benefit to an enemy or to the United States, it would appear reasonable and proper to leave to the Executive Department the matter of terminating or suspending authority conferred before the war, or otherwise regulating, if this be deemed desirable in the execution of the "protective program". With the performance of this duty the Department is specially charged; and to this end, is possessed of fitting and ample facilities and powers.

For the reasons set forth, the authority to vote upon the proxies was not terminated or suspended by the advent of war. Other objections to the election, mentioned in the bill, were not pressed and need not be discussed. It follows that the individual respondents were validly elected directors at the March 1942 meeting.

A decree accordingly has been advised.