LEONARD ALDRIDGE,

*vs.*

FRANCO-WYOMING SECURITIES CORPORATION, a corporation of the State of Delaware, LESTER S. GRANT, DAVID B. TRAMMEL and WILLIAM D. WALTMAN.

*New Castle, June 14, 1945.*

·*Aaron Finger,* of the firm of Richards, Layton & Finger, and *Richard J. Cronan,* of the firm of Kaufman & Cronan, of New York City, for complainant.

*Clarence A. Southerland,* of the firm of Southerland, Berl & Potter, for defendants.

PEARSON, Vice-Chancellor: Complainant prays for a decree of cancellation of 700 shares of the corporation's stock issued in 1944. As ground for this, he asserts that the

motivating purpose of the directors in issuing the shares was improper in that it was to maintain control of the corporation.

Until the fall of 1944, the corporation had outstanding 500 shares of $10 par value capital stock. Complainant owned 150 shares; defendant Waltman, 10 shares; and certain residents of France owned the remaining 340 shares. Prior to the outbreak of the war with Germany, the French stockholders sent Waltman proxies to vote their shares at stockholders' meetings during the period from 1941 to 1944. With the beginning of the war, communication with the French stockholders was forbidden, and the proxies exercised without instruction from them at stockholder's meetings each year to and including 1944. The proxies represented a majority of the outstanding shares, and voting them may thus be said to have controlled the election of directors for these years. The proxies expired in November 1944. At a stockholders' meeting in the preceding May, an amendment of the certificate of incorporation was approved which increased the authorized capital stock from 500 to 2000 shares. The directors, at a meeting shortly thereafter, voted to issue 700 shares at $10 each. The corporation issued 14 shares to Waltman, representing the number to which he was entitled by virtue of his pre-emptive rights. It issued 476 shares, being the total number which would have been offerable to the French shareholders if communication with them had been permissible, in several blocks to the individual defendants, Waltman, Trammell, and Grant. They were three of the four directors of the corporation. These shares were issued subject to subscription agreements which will be described later. The corporation offered complainant 210 shares, the number determined by his pre-emptive rights. Complainant protested against the issuance of any shares, but "to protect his position as a stockholder" subscribed for his allotment.

Complainant contends that the only serious purpose of

the directors in issuing the additional shares was to provide a means to retain control of the corporation after the expiration of the proxies of the French shareholders in November. He points out that when the directors authorized the issuance of the additional shares in May 1944, it was by no means certain that communication with France would be re-established in time to permit the obtaining of new proxies from the French shareholders to be voted at the annual meeting of stockholders in March 1945. As events transpired, new proxies were received and were voted at the 1945 meeting. Since the result of that election would be the same whether or not the votes representing the newly issued shares were counted, complainant abandoned all prayers for relief, except for the cancellation of the 700 shares. Complainant says that the law on which he relies is plainly stated in *Kingston v. Home Life Ins. Co.*, 11 *Del. Ch.* 258, 264, 101 *A.* 898, 900, affirmed 11 *Del. Ch.* 428, 104 *A.* 25, as follows: "New shares cannot be issued for an improper purpose, as for instance, to maintain control of the corporation." This principle has been recently considered and discussed in *Yasik v. Wachtel,* 25 *Del.Ch.* 247, 17 *A.* 2d 309.

Defendants contend that the issuance of the additional shares was impelled by complainant himself. At the annual stockholders' meeting in March 1944, complainant was represented by his attorney in fact, Mr. Holmes, and by one of his solicitors in this case, Mr. Cronan. The statements of these gentlemen comprise the major part of the typewritten transcript of what was said at the meeting. One or both of the representatives protested against the consideration of proxies submitted on behalf of the French shareholders, stating grounds at length; later renewed the protest on additional grounds; protested against the qualifications of the inspectors of election; moved an adjournment of the meeting until answers to questions previously put had been received; excepted to the receipt of the report of inspectors of election; moved to suppress their report;

voted against a resolution concerning the time and place of meeting of the newly elected board; objected to a final adjournment of the meeting. The validity of these objections and protests are not here in issue, and for present purposes perhaps it is enough to say that none of them has been pressed.

The chairman of the meeting presented, at the request of one of complainant's representatives, a balance sheet of the corporation which showed that its apparent liabilities (other than capital stock) exceeded its apparent assets by almost $7,000. This was the subject of considerable comment and inquiry on the part of the representatives, including the following:

"A further question, have the directors taken any steps to rectify the situation or to increase the capital of the Corporation? * * *

"Could you tell me during how many years or for what period the Corporation has been in a completely insolvent state? * * *

"It would seem from the deficit appearing on the balance sheet that steps should be taken by the directors to call on the shareholders for further subscriptions or contributions to capital to put the balance sheet of the Company in balance and I therefore move that the matter of the further subscription from the shareholders to remedy the situation shown on the balance sheet be taken under advisement by the Board of Directors and that action be taken on it. * * *" [The motion was defeated.]

"* * * it would appear from the income and expense account that this deficit status of the Company has been in existence for a long period of time, and certainly for the last few years, and that in so far as the Board of Directors have done nothing to remedy the situation, they have failed in their obligations and duties to the Corporation and to the shareholders thereof and that their conduct in this respect should be censured, and I so move. * * *" [The motion was defeated.]

"On behalf of Leonard Aldridge, for whom I hold a proxy, I protest against the nomination of the above-named persons [the former directors] to the office of directors of the Corporation on the grounds heretofore assigned and on the further ground that their conduct in continuing the Corporation in its present deficit condition, in which all of its capital has been wiped out, is highly reprehensible and that they

are not entitled to the further confidence of the shareholders of the Corporation. * * *"

Complainant's representatives contended throughout the period from the stockholders' meeting in March, 1944 until the trial in this court in March 1945 that complainant had no previous knowledge of the deficit. It was established, however, at the hearing, that a balance sheet of the corporation showing a deficit in approximately the same amount was received by complainant's secretary in 1937.

After the March 1944 meeting, Waltman, as president of the corporation, wrote complainant's attorney in fact answering numerous inquiries which had been made at the meeting. He referred to the deficit and stated that it had existed for some time. He said there was then no reason why the board of directors should give consideration to contributions of additional capital to the company for reason that the corporation had in the United States funds more than ample for any possible demands here; and that it was more than probable that a "hidden reserve" in excess of the deficit existed because certain claims on outstanding coupons or talons (which were issued in connection with deposits of shares of Franco-Wyoming Oil Company), were barred by limitations.

Although at the hearing it was complainant's position that these reasons were satisfactory, complainant's attorney had replied on April 4 to Waltman's letter in a different vein, saying with respect to the deficit:

"I am at a loss to understand why you put the word 'deficit' in quotes. The deficit is real. You admit it in your letter. The liabilities have exceeded the assets, apparently, for many years and in a substantial amount. Neither Mr. Aldridge nor I had the slightest idea that this situation existed, or we would have attempted earlier in spite of the Gaillochets' absolute control, to have the situation remedied. * * *

"Your statement that the corporation has funds in the United States sufficient to meet any possible demands which might be made upon it here, does not frankly face the question. * * * That some

creditors cannot or do not present their claims does not make a debtor solvent where he is factually insolvent, nor justify the use of funds entrusted to the corporation for payment of coupons, except for that specific purpose. * * *

"Your explanation that a number of outstanding talons for past dividends have been lost or destroyed and are barred by limitations is misleading and unfounded, because under the terms of the agreement with the Oil Company, the dividends barred by limitation are returnable to the Oil Company, and for this reason alone, your suggestion that a hidden reserve may exist is absurd. * * * The political changes which have taken place in France and which are certain to take place immediately after the war are likely to create an immediate demand for payment of all outstanding coupons, and the interests of the stockholders of Franco-Wyoming Securities Corporation can be safeguarded only by immediately taking the proper steps to put the corporation on a sound financial basis. * * *

"In conclusion, I can only state that the financial statement and your letter all too clearly confirm that the management of this corporation has been conducted without regard for any but the controlling interest and that the directors, whether they be the French nominees of the Gaillochets, or those that you have put in office here under the instructions received from the Gaillochets, have been most negligent in failing to take steps to put this corporation upon a sound financial basis. * * *

"Your letter implies that you and the present directors have no thought of taking any steps to remedy the situation and I would ask you to advise me whether after consideration of the foregoing, your attitude in this matter remains unchanged."

It was not until this letter of April 4 was received that the meeting of stockholders was called for May 2, at which an increase in the capital was authorized. At that meeting, complainant's representatives opposed the increase, without then or later offering any explanation of their abrupt about face, except possibly the bare assertion that the purpose was to maintain control.

A majority of the stock of the corporation being owned by Frenchmen, the corporation was prohibited from issuing additional capital stock without a license pursuant to the provisions of Executive Order 8389 and Regulations. The directors applied for a license to increase the capital by is-

suing 700 shares, stating in the application that "The purpose of such increase in capital is to make the book value of its assets at least equal to the amount of its liabilities." The application set forth that complainant and Waltman would each be offered a portion of the proposed issue in the ratio of the number of shares then owned by them, respectively, to the total then outstanding; that since communication with the French stockholders was forbidden, "It is contemplated that the shares of stock to which they would be entitled to subscribe if they were not technically enemy aliens will be subscribed for and purchased solely by native-born citizens of the United States who will purchase such shares of stock as permanent investments solely for their own respective accounts." The Treasury Department denied the application. The corporation inquired the reason for the denial and was advised that it was "because of the Treasury Department's belief that the issuance of new stock should be deferred until such time as the French stockholders are in a position to express a desire as to whether or not they wish to acquire additional stock in the corporation." Later, the corporation filed a new application for leave to issue 700 shares, of which 224 would be offered to complainant and Waltman, and the remaining 476 would be issued subject to subscription agreements with the individual defendants. Copies of the proposed agreements were made part of the application. They provided that the 476 shares should be issed in blocks of such number of shares as the French shareholders would be entitled to subscribe for, respectively, but for the restrictions occasioned by the war. Each agreement provided that a named French shareholder might purchase the block to which the offer related, within a reasonable time after communication with such shareholder became lawful, at the cost price of the shares, together with interest; that the stock certificate to be issued should bear a legend referring to the agreement. Pursuant to this second application, the Secretary of the Treasury granted a license dated September 18, 1944. The

license authorized the sale of the 476 shares pursuant to the subscription agreements, and directed that the proceeds of the sale should be deposited in a blocked account, and the certificates for the shares so issued were likewise directed to be held in blocked accounts. All of this was done in accordance with the license.

Defendants take the position that the expressions of complainant's representatives with respect to the deficit led them to believe that complainant might institute proceedings for the appointment of a receiver on the ground of insolvency. They say that experience had shown that complainant had not in the past been unwilling to litigate, for he had previously brought suits in this court concerning the control of defendant corporation, and of Franco-Wyoming Oil Company (the voting control of which is reposed in the defendant). *Aldridge v. Franco-Wyoming Oil Company*, 24 *Del.Ch.* 126, 7 *A.2d* 753; *Id.*, 24 *Del.Ch.* 349, 14 *A.2d* 380; *Aldridge v. Franco-Wyoming Securities Corporation*, 26 *Del. Ch.* 213, 26 *A.* 2d 544; *Id.*, 27 *Del. Ch.* 80, 31 *A.* 2d 246.

Complainant has failed to make out a case of "improper purpose" in the issuance of the shares. There existed a deficit, signalized by complainant's attorney as "real". Resort to the issuance of new shares is hardly an inappropriate means for raising money to eliminate a deficit. It is a means suggested and urged by complainant's own representatives. They asked for what they got. As to the fact that the individual defendants, being directors, purchased a large portion of the stock, subject to the agreements, there is no indication in the record that the Treasury Department would have licensed any issuance which did not provide some protection for the interests of the French shareholders. The reasons for the denial of the first application for a license point to the contrary. In any event, complainant was offered the full number of shares to which his pre-emptive rights entitled him. The method of disposal of the remaining shares seems no more than a fair and practical arrange-

ment affording protection for the interests of the share-holders who could not, because of conditions created by the war, come forward to protect themselves.

The most that can be reasonably inferred from anything upon which complainant relies to show an improper purpose is that the directors wished to remain in control, and that they realized that their own wishes might be fulfilled by granting complainant's wish for the elimination of the deficit by the issuance of new shares. That is certainly not a showing of improper purpose. There is no equity in complainant's case and the bill should be dismissed.

A decree accordingly will be advised.